Kousha Berokim | SBN 242763
**BEROKIM LAW**
270 North Cañon Drive, Third Floor
Beverly Hills, California 90210
T (310) 846.8553 | F (310) 300-1233
berokim@berokim.com

Attorneys for Plaintiff Victor Sanchez and
on behalf of himself and all others similarly situated

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

VICTOR SANCHEZ, an individual and on behalf of all others similarly situated,

Plaintiff,

v.

DAVITA INC., a Delaware corporation; MARTHA TASHJIAN, an individual; SHELLY MARTINEZ, an individual; and Does 1 to 100, inclusive,

Defendants.

**Case No. 2:25-cv-10742**

**(Removed from the Los Angeles County Superior Court Case No. 25STCV29466)**

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **Negligence**
2. **Unfair Competition**
3. **False Advertising**
4. **Concealment**
5. **Intentional Misrepresentation**
6. **Negligent Misrepresentation**
7. **Breach of Fiduciary Duty**

**DEMAND FOR JURY TRIAL**

**Complaint filed: October 8, 2025**
**Date removed: November 7, 2025**

//

//

//

//

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

Plaintiff Victor Sanchez, on behalf of Plaintiff and all others similarly situated, alleges as follows:

## GENERAL ALLEGATIONS

## SUMMARY OF THE CLAIM

1. Dialysis provider, Defendant DaVita Inc. ("DaVita"), has implemented a scheme to fraudulently coerce many of its patients into receiving dialysis at home instead of at its clinics. The majority of those patients are not medically or otherwise suited for home dialysis, and in fact are subjected to unnecessary serious risks of infection and other harms, which could be avoided or lessened through clinic dialysis.

2. To implement this scheme, DaVita has placed individuals with executive sales background and absolutely no medical background, to implement fraudulent coercive schemes to force DaVita's medical and often non-medical staff to target and bully vulnerable patients with individualized false messaging into receiving home dialysis. For example, in Los Angeles, DaVita has placed a former Starbucks regional manager, Shelly Martinez, and a former Target store manager, Martha Tashjian, in higher management positions, as DaVita's Los Angeles regional manager, and as the director of one of DaVita's mega-clinics, respectively, to implement this scheme.

3. Patients forced or tricked into home dialysis often suffer from serious harm and infection from self-administered home dialysis, resulting in hospitalization, compromised health, lesser odds of receiving kidney transplant, and shortened lives.

4. DaVita's only reason for this scheme is money. By forcing patients to receive Dialysis at home, DaVita's clinic overhead for staffing is significantly reduced, while additional chairs are opened up at its clinics for new patients. At the same time, DaVita charges more for home dialysis than clinic dialysis, because home dialysis is required to be done every day, whereas clinic dialysis is usually only done about three times a week, resulting in double charges for services and supplies. Through this scheme, DaVita gains billions of dollars in profits.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

5. It must be stressed at the outset of this Complaint that the subject of this claim is not home dialysis. Although, clinic dialysis is generally safer and more effective than home dialysis, for some patients, home dialysis may be proper, or even necessary. Many other patients knowingly assume the inherent risks of home dialysis as it may better suit their needs, health, and lifestyle. **Rather, this claim concerns DaVita's systematic fraudulent scheme to coerce Class Members who otherwise are not suited for home dialysis into home dialysis, through lies, omissions, and coercion, solely for significant financial profits**. These Class Members suffer severe infections, and other physical, and emotional damages, as a result of home dialysis.

## PARTIES

### A. Plaintiff

6. Plaintiff Victor Sanchez is an individual residing in Los Angeles County, California and at all relevant times to this Complaint was a patient of Defendant DaVita Inc.

### B. Defendants

7. Plaintiff is informed and believes and based thereon alleges that Defendant DAVITA INC., (hereinafter, "DaVita") is, and at all times relevant to this Complaint was, an entity engaged in the provision of dialysis treatment, conducting business in United States of America, including California.

8. Plaintiff does not know the true names or capacities of the Defendants sued as DOES 1 through 100, inclusive. Thus, Plaintiff sues these Defendants under fictitious names. When their true names and capacities have been ascertained, Plaintiff will amend this Complaint.

9. Plaintiff is informed and believes, and based thereon alleges, that the fictitiously named Defendants were the agents, servants, and employees of each of the named Defendants and, in doing the acts and things alleged, were at all times acting within the course and scope of that agency, servitude, and employment and with the permission, consent, and approval, or subsequent

ratification, of each of the named Defendants. Reference to "Defendants" includes the named Defendant and the DOE Defendants.

10. Plaintiff is informed and believes, and based thereon alleges, that at all material times, each of the Defendants was the agent and/or employee of each of the remaining Defendants, and each of them was at all material times acting within the purpose and scope of such agency and employment.

11. Plaintiff is informed and believe and thereon allege that there exists such a unity of interest and ownership between Defendants and Does 1 to 100 that the individuality and separateness of those entities have ceased to exist.

12. Plaintiff is informed and believe and thereon allege that there exists such a unity of interest and ownership between Defendants and Does 1 to 100 that the individuality and separateness of those Defendants have ceased to exist. The business affairs of Defendants', and Does 1 to 25 are, at all times relevant hereto were, so mixed and intermingled that the same cannot reasonably be segregated, and the same are in inextricable confusion. Defendants are, and at all times relevant hereto were used by Does 1 to 100, and each of them, as mere shells and a conduit for the conduct of certain of Defendants' affairs. The recognition of the separate existence of Defendants and Does 1 to 100, would not promote justice, in that it would permit Defendants to insulate themselves from liability to Plaintiffs. Accordingly, Defendants and Does 1 to 100, constitute the alter egos of each other, and the fiction of their separate existence must be disregarded at law and in equity because such disregard is necessary to avoid fraud and injustice to Plaintiffs herein.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

**JOINT LIABILITY ALLEGATIONS**

13. Plaintiff is informed and believes and based thereon alleges that all the times mentioned herein, each of the Defendants was the agent, principal, employee, employer, representative, joint venture or co-conspirator of each of the other defendants, either actually or ostensibly, and in doing the things alleged herein acted within the course and scope of such agency, employment, joint venture, and conspiracy.

14. All of the acts and conduct described herein of each and every corporate defendant was duly authorized, ordered, and directed by the respective and collective defendant corporate employers, and the officers and management-level employees of said corporate employers. In addition thereto, said corporate employers participated in the aforementioned acts and conduct of their said employees, agents, and representatives, and each of them; and upon completion of the aforesaid acts and conduct of said corporate employees, agents, and representatives, the defendant corporation respectively and collectively ratified, accepted the benefits of, condoned, lauded, acquiesced, authorized, and otherwise approved of each and all of the said acts and conduct of the aforementioned corporate employees, agents and representatives.

## JURISDICTION

15. Jurisdiction is conferred on this Court over each Defendant named herein as each Defendant conducts business in California. Jurisdiction is conferred on this Court as to all Claims for Relief as they arise under state statutory or common law. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States and pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) because at least one plaintiff and defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because DaVita conducts business in this district, is subject to personal jurisdiction in this district, and is therefore deemed to be a citizen of this district. Moreover, the unlawful acts alleged herein have a direct effect on Plaintiff and Class Members in Los Angeles County, and numerous Class Members in Los Angeles County have been patients of Defendants.

17. This Court has personal jurisdiction over DaVita because it has conducted substantial business in this judicial district and throughout the United States.

18. Plaintiffs have complied with California *Code of Civil Procedure* § 364.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

## FACTUAL BACKGROUND

19. DaVita is a Fortune 500 corporation and one of the largest dialysis providers in the world. Dialysis is a life-sustaining treatment in which a machine takes over the work of the kidneys by removing blood, filtering it, and returning it cleansed to the body. As a healthcare company entrusted with providing life-sustaining treatment, DaVita owes its patients honesty, transparency, and care.

20. DaVita operates close to 3000 outpatient dialysis centers ("dialysis clinics") throughout the United States. At these clinics, DaVita provides hemodialysis ("clinic dialysis"). Hemodialysis is a life-sustaining treatment for kidney failure that filters waste, excess fluids, and toxins from the blood using an external machine. Hemodialysis is typically conducted three times a week for 3–4 hours per session.

21. DaVita also offers home dialysis to its patients, which is also known as Peritoneal dialysis ("PD"). PD is a needle-free, at-home treatment that uses a surgically placed abdominal catheter to infuse and drain a cleansing solution ("dialysate"), often with the aid of an automated "cycler" machine. Through this method, waste products are absorbed into the dialysate, which is then drained from the body. PD is conducted everyday, and it typically lasts 8-12 hours. It is usually done throughout the night while the patient sleeps through some of the treatment.

22. DaVita, for at least the past ten (10) years and continuing to this day, has designed and executed a profit-driven scheme to fraudulently and unnecessarily coerce vulnerable patients—Class Members—into PD, to maximize DaVita's revenue while exposing Class Members to severe and undisclosed risks.

23. DaVita has directed its regional and clinical directors, as well as other managing agents, to use their sales backgrounds to drive up the number of patients placed on PD treatment.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

Acting under DaVita's instructions, regional and clinical directors pressure not only medical professionals—such as doctors and nurses—but also non-medical personnel, including social workers and receptionists, to coerce patients into choosing PD.

24. To facilitate this scheme, DaVita implemented a program called "MATCH-D," a sales campaign falsely presented as patient education. Through MATCH-D, regional and clinical directors, together with other DaVita managing agents, instruct staff to aggressively push PD on patients, even when patients voice concerns or when PD is medically inappropriate. Through MATCH-D, Defendants track DaVita's staff's forced efforts in pushing PD on patients, and use MATCH-D to provide individualized messaging and other tactics for each targeted patient to be implemented through the assigned staff member as to each targeted patient. The driving force behind these efforts is not patient health or informed choice, but DaVita's financial gain. In other words, DaVita is not concerned about whether PD is the right choice for a particular patient; it is only concerned about increasing sales and profits, which PD would accomplish.

25. As part of this ongoing campaign, regional and clinical directors, along with other DaVita managing agents, routinely coerce both medical and non-medical personnel to pressure as many patients as possible into transitioning to PD.

26. To enforce compliance, Defendants impose quotas requiring DaVita personnel to meet minimum numbers of patient conversions to PD. Staff performance is judged not by the quality of patient care, but by how many patients they could convince to switch treatments.

27. Employees who fail to meet these quotas are subjected to retaliation, intimidation, and humiliation by DaVita's managing agents and regional and clinical directors, placing their jobs at risk.

28. DaVita, through regional and clinical directors, among other managing agents, also require staff to log and track every patient who was approached about PD. Staff are

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

instructed to record their efforts to persuade patients, note whether each patient agreed to PD, and, if not, document the reasons for refusal. These records are used to monitor and pressure employees into intensifying their sales efforts.

29. In addition, Davita, through its regional and clinical directors, hold mandatory weekly meetings with staff to review the staff's progress as to coercing targeted patients into PD, push the staff to more aggressively target patients, discuss strategies to convert more patients, guide the staff as to how to force each individual targeted patient into PD, and devise new coercive tactics. At these meetings, DaVita distributes promotional materials—including brochures and videos—to be shown directly to patients. Employees are also shown propaganda videos featuring supposed PD "success stories" and are drilled on talking points designed to mislead patients into believing PD is safer, easier, and more beneficial than it actually is.

30. To further drive conversions, DaVita systematically misleads patients about the risks and benefits of PD. Staff are instructed to recite a scripted list of exaggerated and false claims, including that PD is easier, allows for travel and swimming, preserves kidney function, involves fewer dietary restrictions, and leads to better transplant outcomes. DaVita also assure patients that supplies could be shipped anywhere and that catheter issues are rare or nonexistent—representations that are false and designed solely to induce patients to accept PD.

31. DaVita train its staff to tailor their manipulative sales pitches to each patient's personal circumstances. For instance, if a patient mentions needing to travel for work, DaVita staff are taught to falsely claim that PD allows for easy travel and on-the-go treatment. Staff are encouraged to use patients' vulnerabilities, fears, and needs as leverage to close the "sale."

32. These promises are crafted to make PD sound superior to in-center dialysis, while downplaying or ignoring the reality of PD's dangers.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

33. The truth is starkly different. Generally, and as to most patients, clinic dialysis is safer and more effective than PD. PD carries serious risks, which DaVita routinely conceals. The risks associated with PD are lengthy. They include, but are not limited to:

a) **Risk of Infection:** There is a high potential for patients using PD to contract serious infections such as peritonitis. Peritonitis is the most serious and sever risk of PD. Peritonitis is an infection and inflammation of the lining of the abdominal cavity. Peritonitis occurs in PD when bacteria enter the abdomen through the PD catheter during fluid exchanges, often from contamination of the catheter or exit site. Patients who suffer from Peritonitis, are often hospitalized for extended time, and suffer from compromised health, lesser chances of receiving a kidney transplant, and shortened lives. **One out of every three PD patients experience at least one episode of peritonitis._At the same time, clinic dialysis does not subject patients to peritonitis, whatsoever**. As to other sever infections, patients on clinic dialysis are subjected to substantially lower risk of other infections than PD. One out every three PD patients experience a serve infection in their first year, whereas only 10 percent of clinic dialysis patients experience a serve infection in their first year. More than 90 percent of PD patients who experience a severe infection require hospitalization, whereas only 70 percent of clinic dialysis patients who suffer from severe infection require hospitalization.

b) **Hernia Risk:** Increased abdominal pressure from PD fluid can lead to hernias, particularly in the abdominal wall.

c) **Bulky Equipment:** Automated PD machines are large (approximately 20" × 13" × 24") and weigh about 25 pounds, which can limit their portability, rendering it difficult to travel with and do treatment on-the-go as advertised by DaVita.

d) **Travel Challenges:** The bulky machines and supplies require substantial storage and are extremely difficult to transport, making travel burdensome or impossible.

e) **Storage Requirements:** Supplies and equipment require significant storage space, which may be difficult for some patients.

f) **Sleep Disruption:** Automated cyclers may trigger alarms during the night if the patient's sleep position obstructs fluid flow, thereby frequently interrupting sleep.

g) **Daily Treatment Commitment:** PD requires treatment seven days a week, whereas traditional in-center dialysis requires a fewer number of treatments.

h) **Treatment Fatigue:** Unlike in-center dialysis, PD requires daily treatment, seven days a week, with no meaningful breaks or recovery periods. Over time, this relentless regimen causes severe physical and emotional exhaustion, leading to burnout and disruption of daily life. Many patients eventually become unable or unwilling to maintain the demanding treatment schedule. When PD treatments are missed or discontinued, patients are deprived of the necessary level of dialysis, resulting in the accumulation of toxins in the body—conditions that can cause serious medical complications and, in some cases, death.

i) **Time Requirement:** Daily exchanges are time-consuming (setup typically takes at least 20 minutes) and may disrupt daily activities.

j) **Strict Sterility Requirements:** Diligent and proper hand hygiene and sterile technique are critical to avoid infection.

k) **Permanent Catheter:** A PD catheter remains in the abdomen at all times and is externally secured with tape. This can often be uncomfortable or aesthetically unappealing.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

l) **Catheter Complications:** The catheter may become blocked, kinked, or infected, complicating treatment.

m) **Metabolic Effects:** PD solutions contain dextrose, which can be absorbed into the body, potentially causing weight gain or elevated blood sugar—particularly concerning for patients with diabetes.

n) **Potential Back Pain:** Increased abdominal pressure and weight from PD fluid can contribute to back discomfort.

o) **PD IS LESS EFFECTIVE THAN CLINIC DIALYSIS:** STUDIES FROM COUNTRIES AROUND THE WORLD INCLUDING THE UNITED STATES AND IN COUNTRIES SIMILAR TO THE US LIKE AUSTRALIA AND CANADA, CONSISTENTLY SHOW 5 TO 10 PERCENT INCREASED RISK OF VASCULAR AND OTHER COMPLICATIONS FROM PD COMPARED TO CLINIC DIALYSIS, AND 5 TO 7 PERCENT INCREASED RISK OF DEATH FOR PD PATIENTS COMPARED TO CLINIC DIALYSIS PATIENTS.

34. Yet DaVita staff conceal and deny these risks, choosing instead to push false reassurances in order to secure conversions to PD. For example, although it is well documented that PD subjects patients to risk of peritonitis and other infections, while clinic dialysis does not subject patients to risk of peritonitis, and general infection rate is lower for clinic dialysis than PD, DaVita, through manipulation, falsification, concealment, and fabrication, routinely misrepresents to its patients that PD has a lower infection rate.

35. DaVita provides extensive print and digital materials to promote PD. Through this material, DaVita falsely and knowingly overstates the advantages of PD, while fraudulently dismissing the disadvantages of PD, such as PD's high infection rate, by referring to the

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

disadvantages as "myths". Class Members are handed these print material, and advised to visit DaVita's website to further learn about PD.

36. To provide a general example of such fraudulent conduct, DaVita, on its website, and in its print material, under the title "Common Myths of Peritoneal Dialysis (PD)", lists the following as the first 'PD Myth': "**Myth 1: Infections are more common with PD".** Then, to explain this false claim, DaVita provides:

> False. Peritonitis, the most common infection for people on PD, can actually be prevented with proper training and handwashing techniques. If an infection does develop, it can often be treated at home with antibiotics. (https://davita.com/treatment-options/articles/common-peritoneal-dialysis-myths-revealed/)

37. It is needless to say that painting PD's high and deadly infection rate as a myth, under the disguise that if you wash your hands well you are less likely to get infected, is dangerous and objectionable conduct.

38. DaVita's claim that 'it is a myth that infections are more common with PD' is a serious, material, and deadly misrepresentation. As stated above under Paragraph 33 (a), infection rates for PD are significantly higher and more severe than clinic dialysis. As shown above in Paragraph 36, DaVita cleverly and fraudulently misrepresents the infection rate in its website and print material handed to patients as a myth to gain their trust and reliance in convincing them to transition to PD.

39. DaVita's coercion tactics go even further. Staff corner Class Members immediately after dialysis sessions, when Class Members are exhausted, lightheaded, or semi-conscious, exploiting them at their most vulnerable. Class Members are rushed through so-called "training," pressured to meet with DaVita PD educators even after declining PD, and bombarded with promotional trinkets like t-shirts and stickers emblazoned with slogans such as "Ask me

about home dialysis" and "Home Wherever You Roam." Staff are required to hand patients print publications referenced above, and advise patients to visit DaVita's website to learn more about PD. Staff are required to track patient refusals in logs, turning vulnerable patients into sales quotas rather than human beings in need of care.

40. Each Class Member was fraudulently coerced into PD through one or more of the foregoing tactics and schemes by DaVita.

41. As a direct and proximate result of Defendants' wrongful conduct, each Class Member has suffered, and continues to suffer, significant harm, including but not limited to the following injuries and damages:

a) **Serious Infection**: Class Members contract—or face a substantial risk of contracting—life-threatening infections such as peritonitis—an infection and inflammation of the lining of the abdominal cavity—resulting from bacterial contamination of the PD catheter or exit site during fluid exchanges.

b) **Hernias and Abdominal Damage**: The constant pressure of PD fluid within the abdomen causes hernias, particularly in the abdominal wall, leading to pain, weakness, and potential need for surgical intervention.

c) **Bulky and Unmanageable Equipment**: The automated PD machines provided are excessively large and heavy (approximately 20" × 13" × 24" and weighing about 25 pounds), rendering them difficult to move, store, or transport—contrary to DaVita's representations of portability.

d) **Travel Limitations and Burdens**: Because of the bulkiness and volume of the required equipment and supplies, Class Members struggle or are unable to travel as promised, forcing them to forgo personal and professional opportunities.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

e) **Storage Constraints**: PD equipment and supplies demand extensive storage space within Class Members' homes, creating physical inconvenience, clutter, and safety hazards—especially for those in smaller living environments.

f) **Sleep Disturbance and Fatigue**: Automated PD cyclers frequently trigger alarms throughout the night, particularly when a Class Member's sleep position obstructs fluid flow, resulting in chronic sleep interruption and exhaustion.

g) **Daily Treatment Burden**: Unlike in-center dialysis, which occurs three times per week, PD requires daily treatment—seven days a week—imposing a relentless schedule that disrupts normal life and rest.

h) **Treatment Fatigue and Burnout**: Class Members subjected to the relentless demands of PD suffer severe physical and emotional exhaustion due to the requirement of performing treatment every single day without reprieve. This constant burden leads to burnout, disruption of daily life, and diminished mental and physical well-being. As fatigue sets in, many Class Members struggle to maintain the daily regimen, resulting in skipped or incomplete treatments. The resulting lack of adequate dialysis causes toxin buildup in the body, placing patients at heightened risk of serious medical complications, hospitalization, and even death.

i) **Excessive Time Demands**: Daily setup and exchange procedures are time-consuming—taking at least 20 minutes per session—and interfere with Class Members' work, family responsibilities, and daily activities.

j) **Strict and Stressful Sterility Requirements**: To avoid infection, Class Members must adhere to meticulous hand hygiene and sterile procedures. This constant

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

vigilance imposes significant stress and anxiety, as even minor errors can lead to serious infection.

k) **Permanent and Uncomfortable Catheters**: Class Members are required to live with a permanent catheter surgically implanted in their abdomen, which is externally taped to the skin, often causing physical discomfort, irritation, and embarrassment.

l) **Catheter Malfunctions and Complications**: The PD catheters frequently become blocked, kinked, or infected, causing treatment interruptions, additional procedures, and, in many cases, surgical repair.

m) **Metabolic and Weight Effects**: PD solutions contain high levels of dextrose that are absorbed into the body, leading to weight gain, elevated blood sugar, and heightened health risks—especially among diabetic Class Members.

n) **Back Pain**: The constant abdominal pressure and added weight from PD fluid contribute to persistent back pain, muscle strain, and reduced mobility.

o) **General Damages**: As a result of the foregoing, Class Members have suffered and continue to suffer severe pain and suffering; emotional distress; mental anguish; anxiety; humiliation; loss of enjoyment of life; loss of confidence in their medical providers; compromised health; lesser chances of receiving a kidney transplant; refusal to receive dialysis; and shortened lives. Class Members have also incurred, and will continue to incur, significant medical expenses, costs of corrective procedures, and other consequential damages.

42. DaVita's motive is simple: financial greed. PD delivers far higher margins than in-center treatment.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

43. First, PD slashes costs. Because patients perform PD at home, DaVita avoids the significant expenses of in-facility care—salaries for nurses, dietitians, and support staff, as well as building and maintenance costs. PD also consumes fewer medical supplies, further reducing overhead.

44. Second, PD drives revenue. (1) Each time a patient is shifted to PD, an in-center chair opens for another paying patient, expanding DaVita's capacity and billings. (2) Unlike in-center dialysis performed only three times a week, PD is done daily, allowing DaVita to collect reimbursement for seven sessions a week and generate a steady stream of inflated revenue. (3) On top of this, government incentives from the Centers for Medicare & Medicaid Services (CMS) make PD even more financially rewarding.

45. The result is staggering: by coercing patients into PD, DaVita rakes in billions of dollars every year—profits achieved not through better care, but by exploiting vulnerable patients.

46. In sum, DaVita's aggressive promotion and coercion of PD is not about patient choice or improved care—it is about maximizing profits and the expense of Class Members' health. Class Members are deceived, pressured, and placed at risk, while DaVita reaps the financial rewards of its systematic exploitation.

**PLAINTIFF VICTOR SANCHEZ**

47. Plaintiff Victor Sanchez is a victim of DaVita's PD scheme as described above. Plaintiff was deliberately targeted by DaVita as part of its profit-driven campaign to coerce vulnerable patients into PD treatment—regardless of medical appropriateness, safety, or patient well-being.

48. In or around 2015, Sanchez was diagnosed with kidney cancer and underwent surgery that required removal of one kidney. As a result, Sanchez was left with serious kidney

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

issues and required dialysis and ultimately kidney transplant, to maintain and prolong his life. In 2024, Plaintiff went to one of DaVita's clinics in Los Angeles to get dialysis treatment.

49. Shortly after beginning dialysis, DaVita, at the order and supervision of Martinez, began aggressively pressuring Sanchez to abandon in-center dialysis and switch to PD. DaVita staff relentlessly bombarded Sanchez with exaggerated claims and outright falsehoods about PD. Sanchez was told that PD would allow him to swim, travel freely, live a "normal life," preserve his kidney function, and almost never cause catheter complications.

50. Because Sanchez frequently travels for work, he informed DaVita of his need for mobility. In response, DaVita staff seized upon that fact and assured him that PD would make travel easy and convenient. Davita told Sanchez that DaVita could ship all PD supplies directly to any travel destination, anywhere, at any time, so that he could do dialysis on the go, and that he could even swim when travelling.

51. At the same time, DaVita deliberately minimized, concealed, and misrepresented the substantial dangers of PD. DaVita failed to disclose, among other things, that:

a) PD patients face a high risk of contracting serious, potentially life-threatening infections such as peritonitis;

b) PD machines are large and heavy, making them cumbersome, difficult to transport, and entirely impractical for travel;

c) the sheer volume of PD supplies makes travel burdensome or impossible, as shipping supplies for short trips is logistically unmanageable;

d) shipments of PD supplies often arrive late or after travel ends, leaving patients without necessary equipment;

e) PD supplies require substantial in-home storage space, creating clutter and safety hazards;

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

f) automated PD cyclers frequently sound alarms throughout the night, causing sleep deprivation and chronic fatigue;

g) the daily nature of PD leads to severe exhaustion, burnout, and disruption of daily life;

h) PD catheters are prone to blockages, kinks, and infections, requiring repeated medical or surgical intervention;

i) the constant abdominal pressure and added fluid weight from PD cause chronic back pain, muscle strain, and reduced mobility; and

j) to be able swim, the pool has to be sanitized, effectively resulting in lack of ability to swim in a public or even private pools.

52. Simultaneously, DaVita used fear tactics to manipulate Sanchez into switching treatments. Staff warned him that if he continued with in-center dialysis, his health would deteriorate—claiming that he would lose all kidney function, lose the ability to urinate, require increased dialysis, and ultimately need antibiotics.

53. DaVita's conduct was not merely misleading; it was predatory. Staff deliberately targeted Sanchez immediately after his dialysis sessions, when he was physically weak, semi-conscious, and suffering from low blood pressure. They exploited him at his most vulnerable moments to push their sales agenda. Making matters worse, DaVita deliberately scheduled Sanchez's dialysis sessions at 4:00 a.m., ensuring he was further fatigued and susceptible to their coercive tactics.

54. Under this sustained pressure and deception, Sanchez felt he had no real choice. Relying on DaVita's false assurances and concealment of the truth, he reluctantly agreed to transition to PD.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

55. Once Sanchez began PD, the truth quickly surfaced: DaVita had concealed the very dangers he was now facing.

56. The massive volume of PD equipment and supplies overwhelmed his living space, consuming far more room than DaVita had disclosed.

57. The cycler machine was extremely bulky and heavy, making travel nearly impossible.

58. Despite DaVita's repeated promises, PD supplies frequently arrived late or failed to reach his travel destinations altogether—leaving him without the materials necessary for treatment during short business trips.

59. The PD catheter, which DaVita staff had assured him would not cause problems, instead caused repeated complications and was extremely difficult to connect to the cycler. Sanchez was forced to undergo surgery to repair the catheter.

60. The cycler's alarms constantly disrupted his sleep, sounding off multiple times each night whenever the catheter disconnected, depriving him of rest and peace of mind.

61. As a result of DaVita's conduct, Sanchez also suffered severe physical and emotional exhaustion from being required to perform PD treatment every single day without rest. The relentless nature of the regimen caused significant fatigue, mental burnout, and disruption of his daily life and well-being. Over time, the exhaustion made it increasingly difficult for Sanchez to keep up with the demanding treatment schedule.

62. The treatment also left Sanchez with persistent, debilitating back pain and muscle spasms that continue to this day.

63. Most devastating of all, Sanchez contracted peritonitis—a severe and life-threatening infection—as a direct result of PD, precisely the risk DaVita had downplayed and dismissed. Sanchez was hospitalized for a week to treat the infection.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

64. After continuing PD treatment, Sanchez contracted peritonitis again, requiring another week-long hospitalization.

65. These repeated infections have not only caused lasting physical harm but have also significantly reduced Sanchez's eligibility and prospects for a kidney transplant, further jeopardizing his health and future.

66. As a direct result of DaVita's calculated deception, coercion, and concealment of material risks, Plaintiff Sanchez suffered severe and permanent injuries, including physical pain, infection, loss of sleep, emotional distress, and diminished quality of life. He also lost trust in his healthcare providers and continues to suffer ongoing physical and emotional harm.

67. Sanchez's experience is not an isolated incident but part of DaVita's widespread, systematic practice of deceiving and coercing patients into PD treatment to maximize profits. Like Sanchez, countless Class Members are targeted through the same coordinated marketing scheme, subjected to the same false promises, omissions, and high-pressure tactics, and ultimately suffered the same types of harm—including infection, physical pain, emotional distress, and financial loss. DaVita's conduct represents not a series of individual missteps, but a deliberate, company-wide policy of prioritizing revenue over patient safety and wellbeing, implemented through sales executives instead of medical directors.

## CLASS ACTION ALLEGATIONS

68. Plaintiff brings this action on behalf of Plaintiff and Class Members as a class action. Plaintiff seeks to represent a class of all current and former patients of DaVita within the United States of America who were deceived and/or coerced into PD through fraudulent and oppressive schemes described in this Complaint, who were otherwise not suited for PD, and then suffered harm and injuries resulting from PD as described in this complaint, at any time

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

commencing ten (10) years preceding the filing of Plaintiff's complaint up until the time that notice of the class action is provided to the class.

69. Plaintiff reserves the right to amend or modify the class description with greater specificity, further divide the defined class into subclasses, and to further specify or limit the issues for which certification is sought.

70. This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

71. In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure 23(c), Plaintiffs seek to represent the following state sub-classes only in the event that the Court declines to certify the Nationwide Class above:

> **California Sub-Class:** Current and former patients of DaVita within the California who were deceived and/or coerced into PD through fraudulent and oppressive schemes described in this Complaint, who were otherwise not suited for PD, and then suffered harm and injuries resulting from PD as described in this complaint, at any time commencing ten (10) years preceding the filing of Plaintiff's complaint up until the time that notice of the class action is provided to the class.

> **Arizona Sub-Clas**s: Current and former patients of DaVita within the Arizona who were deceived and/or coerced into PD through fraudulent and oppressive schemes described in this Complaint, who were otherwise not suited for PD, and then suffered harm and injuries resulting from PD as described in this complaint, at any time commencing ten (10) years preceding the filing of Plaintiff's complaint up until the time that notice of the class action is provided to the class.

> **Nevada Sub-Class:** Current and former patients of DaVita within the Nevada who were deceived and/or coerced into PD through fraudulent and oppressive schemes described in this Complaint, who were otherwise not suited for PD, and then suffered harm and injuries resulting from PD as described in this complaint, at any time commencing ten (10) years preceding the filing of Plaintiff's complaint up until the time that notice of the class action is provided to the class.

**A. <u>Numerosity</u>**

72. The potential Class Members as defined are so numerous that joinder of all the members of the Class is impracticable. While the precise number of Class Members has not been determined yet, Plaintiff is informed and believes that there are over eighty thousand (100,000) Class Members being treated by Defendants in the United States of America.

73. Plaintiff alleges Defendants' PD-treatment records would provide information as to the number and location of all Class Members. Joinder of all members of the proposed Class is not practicable.

**B. Commonality**

74. Each Class Member was fraudulently coerced into beginning PD through one or more of the tactics and schemes by DaVita described above. Each Class Member was misled as to PD's infection rate, as well as other risks, through concealment by the staff, misrepresentation by the staff, and falsehoods in the print adverting material and DaVita's website.

75. Furthermore, each Class Member suffered significant damages described above because PD was never properly evaluated or determined to be medically appropriate for their individual circumstances. Instead, Defendants indiscriminately pushed PD on Class Members to inflate sales figures and increase profit margins, without conducting any meaningful or individualized assessment of whether PD was safe, effective, or suitable for each Class Member.

76. There are questions of law and fact common to Class Members. These common questions include, but are not limited to:

a) Were Defendants negligent when they refused to disclose all risks and dangers associated with PD to Plaintiff and Class Members?

b) Was DaVita negligent in its hiring and reliance on unqualified managers with no medical backgrounds?

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

c) Did Defendants violate 15 U.S.C. § 45(a)(1) by misleading Plaintiff and Class Members concerning PD and profiting from it?

d) Did Defendants violate 15 U.S.C. § 45 by distributing misleading marketing materials and making false claims about PD's benefits?

e) Did Defendants make false representations about the benefits of PD and conceal known risks?

f) Did Defendants breach their fiduciary duties to Plaintiff and Class Members by refusing to disclose all risks and dangers associated with PD to Plaintiff and Class Members?

**C. <u>Typicality</u>**

77. The claims of Plaintiff herein alleged are typical of those claims which could be alleged by any Class Members, and the relief sought is typical of the relief which would be sought by each Class Member in separate actions. Plaintiff and Class Members sustained injuries and damages arising out of and caused by Defendants' common course of conduct in violation of laws and regulations that have the force and effect of law and statutes as alleged herein.

78. Class Members have suffered and continue to suffer severe infection, pain and suffering; emotional distress; mental anguish; anxiety; humiliation; loss of enjoyment of life; loss of confidence in their medical providers; compromised health; lesser chances of receiving a kidney transplant; refusal to receive dialysis; and shortened lives. Class Members have also incurred, and will continue to incur, significant medical expenses, costs of corrective procedures, and other consequential damages.

**D. <u>Adequacy of Representation</u>**

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

79. Plaintiff will fairly and adequately represent and protect the interest of Class Members. Counsel who represents Plaintiff is competent and experienced in litigating dialysis-related actions.

**E. <u>Superiority of Class Action</u>**

80. A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all Class Members is not practicable, and questions of law and fact common to Class Members predominate over any questions affecting only individual Class Members. Class Members, as further described therein, have been damaged and are entitled to recovery by reason of Defendants' policies and/or practices that have resulted in the violation of California law at times, as set out herein.

81. Class action treatment will allow Class Members to litigate their claims in a manner that is most efficient and economical for the parties and the judicial system. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**<u>FIRST CAUSE OF ACTION</u>**
**Negligence**
**(Against Defendant DaVita Inc.)**

82. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as though fully set forth herein.

83. Plaintiff and Class Members are, and at all relevant times have been, patients under the care of Defendants. During their custody of Plaintiff and Class Members to receive dialysis and return home, Plaintiff and Class Members are, and at all relevant times have been, under the care of Defendants who acted as their "primary care medical providers."

84. Defendants owed a duty of ordinary care to the Plaintiff and Class Members, to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

medical professionals would use in the same or similar circumstances.

85. A medical professional is negligent if he or she fails to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful medical professionals would use in the same or similar circumstances.

86. A medical professional acts with willful and wanton misconduct when it acts with absolute and active disregard for the consequences that will likely arise from its actions. "Willful or wanton misconduct is intentional wrongful conduct, done either with a knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results. (*O'Shea v. Claude C. Wood Co.* (1979) 97 Cal.App.3d 903, 912.) Willful misconduct is "an aggravated form of negligence, differing in quality rather than degree from ordinary lack of care." (*Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 360.)

87. Here, not only did Defendants fail to use the degree of care that a reasonably prudent medical provider would use, but Defendants also acted with a wanton and reckless disregard of the likely consequences of their actions. In other words, when Defendants failed to provide the care and treatment within the applicable standard of care, they acted with a wanton or reckless disregard of the fact that Plaintiff and Class Members' injuries would likely result from their actions.

88. As a further direct and legal result of the foresaid, Plaintiff and Class Members sustained damages in a sum according to proof at trial.

89. By virtue of the foresaid, Defendants have each acted with intent and recklessness, and their acts and omissions were despicable. By virtue of the foresaid, punitive damages should be assessed against Defendants and each of them, in a sum according to proof at trial.

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

**SECOND CAUSE OF ACTION**
**Unfair Competition**
**(Against all Defendants)**

90. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as though fully set forth herein.

91. Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are unlawful.

92. In order to increase profits and lower costs, Defendants misled Plaintiff and Class Members about the benefits of PD and downplayed the dangers of PD, convincing Plaintiff and Class Members to undergo PD treatment to their detriment.

93. Defendants' scheme to mislead Plaintiff and Class Members about PD and profit as a result, constitutes unlawful, unfair, and fraudulent business practices pursuant to 15 U.S.C. § 45(a)(1).

94. As a direct and legal result of the foresaid, Plaintiff and Class Members sustained damages in a sum according to proof at trial.

**THIRD CAUSE OF ACTION**
**False Advertising**
**(Against all Defendants)**

95. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as though fully set forth herein.

96. An advertisement is considered deceptive under 15 U.S.C. § 45 if it involves a material representation, omission, or practice that is likely to mislead a consumer acting reasonably under the circumstances.

97. In order to increase profits and lower costs, Defendants distributed misleading marketing materials and slogans concerning PD to Plaintiff and Class Members, and further made false and misleading claims to Plaintiff and Class Members about the benefits of PD.

98. Defendants knew, or by the exercise of reasonable care, should have known, that their marketing materials, slogans, and claims concerning PD were untrue or misleading.

99. Defendants' distribution of misleading marketing materials, slogans, and false claims concerning PD constitutes a violation of 15 U.S.C. § 45.

100. As a direct and legal result of the foresaid, Plaintiff and Class Members sustained damages in a sum according to proof at trial.

101. Plaintiff and Class Members seek to recover the statutory remedy of $2,500 per violation.

## FOURTH CAUSE OF ACTION
**Concealment**
**(Against Defendant DaVita Inc.)**

102. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as though fully set forth herein.

103. DaVita owed a fiduciary duty to Plaintiff and Class Members, and thus had a duty to disclose the dangers and harms of PD, and DaVita intentionally failed to fully disclose the dangers and harms of PD to Plaintiff and Class Members.

104. DaVita disclosed perceived advantages and benefits of PD to Plaintiff and Class Members, but intentionally failed to fully disclose the dangers and harms of PD to Plaintiff and Class Members, making the disclosure deceptive.

105. Plaintiff and Class Members did not know of the dangers and harms of PD.

106. DaVita intended to deceive Plaintiff and Class Members by concealing the dangers and harms of PD to gain their reliance and trust, to undergo PD.

107. Had the dangers and harms of PD been fully disclosed, Plaintiff and Class Members reasonably would have behaved differently and not opted for PD treatment.

108. As a direct and legal result of the foresaid, Plaintiff and Class Members sustained

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

damages in a sum according to proof at trial.

109. DaVita's concealment was a substantial factor in causing Plaintiff and Class Members' harm.

110. By virtue of the foresaid, DaVita acted with recklessness, oppression, and malice in that it acted in conscious disregard of the of the rights and safety of Plaintiff and Class Members, was despicable, and subjected Plaintiff and Class Members to cruel and unjust hardship. By virtue of the foresaid, punitive damages should be assessed against DaVita, in a sum according to proof at trial.

**FIFTH CAUSE OF ACTION**
**Intentional Misrepresentation**
**(Against All Defendants)**

111. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as though fully set forth herein.

112. Defendants represented to Plaintiff and Class Members a list of supposed benefits of PD.

113. Defendants' representations concerning the benefits of PD were false or misleading.

114. Defendants knew that their representations were false when they made it, or they made the representation recklessly and without regard for its truth.

115. Defendants intended that Plaintiff and Class Members rely on their representations.

116. Plaintiff and Class Members reasonably relied on Defendants' representations in undergoing PD.

117. As a direct and legal result of the foresaid, Plaintiff and Class Members sustained damages in a sum according to proof at trial.

118. Plaintiff and Class Members' reliance on Defendants' representations was a substantial factor in causing Plaintiff and Class Members' harm.

119. By virtue of the foresaid, Defendants acted with recklessness, oppression, and malice in that they acted in conscious disregard of the of the rights and safety of Plaintiff and Class Members, were despicable, and subjected Plaintiff and Class Members to cruel and unjust hardship. By virtue of the foresaid, punitive damages should be assessed against Defendants, and each of them, in a sum according to proof at trial.

**SIXTH CAUSE OF ACTION**
**Negligent Misrepresentation**
**(Against All Defendants)**

120. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as though fully set forth herein.

121. Defendants represented to Plaintiff and Class Members a list of supposed benefits of PD.

122. Defendants' representations concerning the benefits of PD were false or misleading.

123. Defendants had no reasonable grounds for believing their representations were true when they made them.

124. Defendants intended that Plaintiff and Class Members rely on their representations.

125. Plaintiff and Class Members reasonably relied on Defendants' representations.

126. As a direct and legal result of the foresaid, Plaintiff and Class Members sustained damages in a sum according to proof at trial.

127. Plaintiff and Class Members' reliance on Defendants' representations was a substantial factor in causing Plaintiff and Class Members' harm.

**SEVENTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against Defendant DaVita Inc.)**

128. Plaintiff realleges and incorporates by reference all of the allegations contained in

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

the preceding paragraphs as though fully set forth herein.

129. DaVita, a medical provider, owed fiduciary duties to Plaintiff and Class Members who were its patients.

130. DaVita breached its fiduciary duties to Plaintiff and Class Members by failing to disclose all material facts concerning PD treatment, including PD's dangers and disadvantages.

131. As a direct and legal result of the foresaid, Plaintiff and Class Members sustained damages in a sum according to proof at trial.

132. By virtue of the foresaid, DaVita acted with recklessness, oppression, and malice in that it acted in conscious disregard of the of the rights and safety of Plaintiff and Class Members, was despicable, and subjected Plaintiff and Class Members to cruel and unjust hardship. By virtue of the foresaid, punitive damages should be assessed against DaVita, in a sum according to proof at trial.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, jointly and severally, as follows:

1. For an order certifying this case as a Class Action;

2. For an order appointing Plaintiff as Class representative and appointing Plaintiff's counsel as class counsel;

3. For economic damages according to proof, no less than one billion dollars;

4. For general damages according to proof at trial, no less than one billion dollars;

5. For compensatory damages according to proof at trial, no less than one billion dollars;

6. For special damages according to proof at trial, no less than one billion dollars;

7. For an order enjoining ongoing unlawful, unfair, or fraudulent business acts or practices pled in this complaint;

8. For an order requiring the defendant to return moneys was acquired through the

unfair, unlawful, or deceptive practices pled in this complaint.

9. For reasonable attorneys' fees;

10. For exemplary and punitive damages according to proof at trial, no less than one billion dollars;

11. For costs of suit incurred herein;

12. For statutory penalties;

13. For civil penalties;

14. For pre-judgment interest;

15. For such other relief as the court deems proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues so triable in the Complaint.

DATED: February 12, 2026

**BEROKIM LAW**

-------------------------------------------------------
KOUSHA BEROKIM
Attorneys for Plaintiff Victor Sanchez and
on behalf of himself and all others similarly situated

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

BEROKIM LAW
Attorneys
270 North Cañon Drive, Third Floor, Beverly Hills, California 90210
berokim.com

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 270 North Cañon Drive, Third Floor, Beverly Hills, California, 90210. On February 12, 2026, I served the herein described document(s) through the means indicated below.

**First Amended Class Action Complaint**

[X] (BY E-MAIL) I transmitted via electronic mail the document(s) listed above to the e-mail addresses set forth below.

**FAEGRE DRINKER BIDDLE & REATH LLP**
JOSHUA E. ANDERSON (SBN 211320)
*josh.anderson@faegredrinker.com*
DAVID A. BELCHER (SBN 330166)
*david.belcher@faegredrinker.com*
KAYLEE A. RACS (SBN 353919)
*kaylee.racs@faegredrinker.com*

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. Executed on February 12, 2026 at Beverly Hills, California.



Kousha Berokim